IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 25, 2021 Session

## STATE OF TENNESSEE v. BYRON HARTSHAW and GARY LEE EMORY

**Appeal from the Criminal Court for Knox County**
**No. 111536, 111537     Steven W. Sword, Judge**

_____

### No. E2019-02200-CCA-R3-CD

_____

A Knox County jury convicted the defendants, Byron Hartshaw and Gary Lee Emory, of robbery, aggravated robbery, and aggravated burglary. The trial court imposed total effective sentences of fifteen years for Defendant Hartshaw and twelve years for Defendant Emory. In this consolidated appeal, both defendants challenge the sufficiency of the evidence, the jury instructions, and the admission of certain evidence. They also contend that the State's closing argument amounted to prosecutorial misconduct. Defendant Emory additionally argues that the trial court provided "improper assistance" to the State, he challenges the length of his sentence, and he contends that cumulative error entitles him to a new trial. After a thorough review of the record and applicable law, we affirm the trial court's judgments

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Andrew Pate, Knoxville, Tennessee, for the appellant, Byron Hartshaw.

Sherif Guindi, Knoxville, Tennessee, for the appellant, Gary Lee Emory.

Herbert H. Slatery III, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Charme P. Allen, District Attorney General; Philip Morton and Ta Kisha Fitzgerald, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the assault and robbery of the victim, Robert Beasley, Defendant Hartshaw's wheelchair-bound uncle, inside Mr. Beasley's residence. The defendants stole the victim's wallet, some cash, a bottle of liquor, and a package of cigarettes. Defendant Hartshaw allegedly pointed a gun at or near the victim. Defendant Emory picked up a hammer during the robbery and video recordings from Mr. Beasley's apartment complex showed Defendant Emory holding the hammer while leaving the scene. For their roles in this incident, a Knox County grand jury indicted the defendants as follows: two counts of aggravated robbery with a deadly weapon (Counts 1 and 2); two counts of aggravated robbery accomplished by display of an article fashioned to lead a victim to reasonably believe it to be a deadly weapon (Counts 3 and 4); two counts of aggravated burglary (based upon theft and assault respectively) (Counts 5 and 6); and one count of employing a firearm during the commission of a dangerous felony (Count 7). The grand jury indicted Defendant Emory with additional counts of employing a firearm during the commission of a dangerous felony with a prior felony conviction (cocaine possession conviction) (Count 8) and unlawful possession of a firearm by a convicted felon (possession of cocaine) (Count 9). For both defendants, the grand jury returned criminal gang offense enhancements: three counts for Defendant Emory (Counts 10, 11, and 12) and two counts for Defendant Hartshaw (Counts 13 and 14).

## A. Pretrial Motions

Prior to trial, Defendant Emory filed a motion for a bill of particulars, related to Counts 1 through 4, "to make clear" what the defendants were defending as it related to the "deadly weapon" and the gun and hammer involved. Defendant Emory sought to clarify whether the State would include the hammer, "allegedly stolen" during the robbery, as a deadly weapon (Counts 1 and 2) or "fashioned or used as" a deadly weapon (Counts 3 and 4)[1]. The trial court questioned the State during the hearing, and the State confirmed that "the deadly weapon is the handgun and not the hammer[.]" The trial court stated that a bill of particulars was not necessary because the hammer was not referred to in the indictment as the deadly weapon.

[1]The language in the indictment for each count is as follows:

Count 1: "did unlawfully, knowingly, by violence, take from the person of Robert Beasley, Personal Property, said taking accomplished with a deadly weapon . . ."

Count 2: "did unlawfully, knowingly, by putting Robert Beasley in fear, take from the person of Robert Beasley, Personal Property, said taking accomplished with a deadly weapon . . ."

Count 3: "did unlawfully, knowingly, by violence, take from the person of Robert Beasley, Personal Property, said taking accomplished by display of an article fashioned to lead Robert Beasley to reasonably believe it to be a deadly weapon . . ."

Count 4: "did unlawfully, knowingly, by putting Robert Beasley in fear, take from the person of Robert Beasley, Personal Property, said taking accomplished by display of an article fashioned to lead Robert Beasley to reasonably believe it to be a deadly weapon . . . ."

Sometime following the hearing on the motion for a bill of particulars, the State listened to the recordings of the preliminary hearings and informed counsel for Defendant Emory, via email, that the evidence showed that Defendant Emory was armed with a gun and a hammer during the robbery. The State indicated its intent to "clarify" that the State's theory now included the hammer as evidence of the deadly weapon. The State further asserted that this theory was not required to be disclosed in a Bill of Particulars. It appears that neither the trial court nor Defendant Hartshaw's counsel were informed of this change in the State's position, and that the matter was not discussed among the parties until the jury charge conference.

In a second motion, Defendant Emory sought to exclude Defendant Hartshaw's jailhouse telephone calls made to Defendant Hartshaw's sister, on the basis that the calls violated Defendant Emory's rights pursuant to the Confrontation Clause of the Sixth Amendment. He further contended that the calls were irrelevant, prejudicial, and inadmissible pursuant to Tennessee Rule of Evidence 404(b). Defendant Emory also argued that some of the statements in the calls brought in extrinsic evidence of another crime, specifically witness tampering. The State responded that it sought to only play clips of the calls and no reference to Defendant Emory would be included. Defendant Hartshaw also objected to the admission of the jailhouse calls, arguing that the prejudicial effect of the calls, which he contended seemed to indicate that witness intimidation took place, without any corroboration of the same, outweighed the probative value of the evidence.

The trial court stated that it had listened to all fourteen audio clips of Defendant Hartshaw's jailhouse calls and concluded that one clip contained a reference to both defendants and was, therefore, inadmissible. The trial court found that the remaining clips were admissible and highly probative of Defendant Hartshaw's guilt. The trial court concluded that the probative value of this evidence was not outweighed by the danger of unfair prejudice to either defendant. The trial court stated that the calls "in no way" implicated or referenced Defendant Emory's involvement in the crime. As to the objection to the relevance of the calls, the trial court stated that they were relevant to show Defendant Hartshaw's guilty conscience based on his statements that he hoped Mr. Beasley would not show up to court. As to Defendant Hartshaw's objection to the calls, the trial court again stated that the calls were highly probative as to his guilty conscience and that there was no danger of unfair prejudice.

Finally, pursuant to Defendant Hartshaw's argument that the calls were inadmissible evidence of witness tampering or intimidation, the trial court conducted an analysis pursuant to Rule 404(b). The trial court stated that it had listened to all of the recordings and found that there was clear and convincing evidence that these calls were recordings of Defendant Hartshaw's voice. The trial court identified the material issue as Defendant

3

Hartshaw's guilty conscience as evidenced by his expressed hope that Mr. Beasley would not testify against him at trial.

## B. Trial

At trial, the parties presented the following evidence: The victim, Robert Earl Beasley, testified that he was forty-nine years old and that Defendant Hartshaw was his nephew. He said that Defendant Hartshaw was "one of [his] best friends" and called him "Uncle Rob." When Mr. Beasley first moved to Knoxville, he lived with Defendant Hartshaw. He testified that he received a monthly supplemental benefit check ("SSI check"), which he used to pay his monthly rent and any debts he acquired throughout the preceding month. Mr. Beasley would spend the rest of the check or give some to his niece, Defendant Hartshaw's sister. Mr. Beasley kept his extra cash inside his underclothes.

At some point, Mr. Beasley moved into an apartment with a woman, Erin Hodge. At times, the defendants would stay overnight with them if the defendants did not want to walk home. Mr. Beasley described his apartment as it was on October 1, 2016. On that day, Mr. Beasley's sister and niece delivered his SSI check to him in the amount of $750. Mr. Beasley cashed the SSI check and used some of the money to buy cigarettes for himself and liquor for Ms. Hodge. He paid a couple of people money that he owed them and kept the remaining cash for himself. That evening, Defendant Hartshaw and Ms. Hodge were sending text messages to each other. Mr. Beasley was not expecting anyone to visit his apartment that night, but then he heard someone's voice calling through his window. Mr. Beasley asked Ms. Hodge who was at the window, and she identified Defendant Emory, saying, "That's G." Defendant Emory continued to call up to Mr. Beasley's apartment for five to seven minutes. Soon after, Defendant Emory knocked on the door of Mr. Beasley's apartment, apparently having been let into the apartment complex by someone else. Mr. Beasley told Ms. Hodge to unlock the apartment door and let Defendant Emory inside the apartment. After Defendant Emory entered, Ms. Hodge locked the door behind him. Defendant Emory unlocked the door again and soon after, Defendant Hartshaw entered the apartment.

Mr. Beasley stated that he was facing away from the door in his wheelchair when the men entered the apartment, and, when he turned around to ask Defendant Emory a question, Defendant Hartshaw "knocked [him] down to the floor." Defendant Hartshaw was being "a little too rough," but Mr. Beasley assumed Defendant Hartshaw was "playing" with him. Defendant Hartshaw "kept on feeling and feeling around," presumably looking for Mr. Beasley's cash. Mr. Beasley testified that Defendant Emory came out of the kitchen holding a gun pointed toward the floor. Mr. Beasley testified that Defendant Emory walked over to the coffee table and picked up "a little red hammer" and Mr. Beasley's cash, both of which were lying on his coffee table. Thinking the defendants

were joking with him, Mr. Beasley told Defendant Hartshaw to ask Defendant Emory to put his money back on the coffee table. Mr. Beasley did not think the men were trying to steal from him.

Defendant Hartshaw proceeded to get on top of Mr. Beasley and tear off Mr. Beasley's underclothes in an effort to find his wallet. At this point, Mr. Beasley realized the men were "for real" and called for Ms. Hodge to call the police. Mr. Beasley recalled that Defendant Hartshaw hit Ms. Hodge, although he did not see it happen, and then Defendant Emory stood over Mr. Beasley and pointed his gun "down at" Mr. Beasley with a "crazy look" on his face. After the defendants left, Mr. Beasley called the police, but Ms. Hodge left the scene due to her being on probation at the time.

Approximately four police officers responded to Mr. Beasley's apartment, and Ms. Hodge returned while they were speaking with Mr. Beasley. Ms. Hodge had a visible injury to her face but told the police she had been in a car accident.

Mr. Beasley recalled that he had just over $200 cash in his wallet, which was taken by Defendant Hartshaw off Mr. Beasley's person, and $360 on his coffee table, which was taken by Defendant Emory. Mr. Beasley recalled that Defendant Hartshaw also took the cigarettes and liquor that Mr. Beasley had recently purchased. Mr. Beasley said that Defendant Emory took his hammer.

Several jailhouse phone calls were played aloud, and Mr. Beasley identified the voices as belonging to Defendant Hartshaw and Hartshaw's sister, Laytona Scott. Mr. Beasley recalled that he telephoned Ms. Scott, who asked Mr. Beasley if he wanted to speak to Defendant Emory. Mr. Beasley recalled speaking to Defendant Emory following the robbery, and Defendant Emory asked Mr. Beasley to lie about Defendant Emory's wielding a gun. Defendant Emory objected to this statement, stating that the State had not disclosed in discovery any statement made by Defendant Emory that would be introduced into evidence, which he contended violated Tennessee Rule of Criminal Procedure 16(a)(1)(B) (requiring the State to disclose a defendant's relevant written or recorded statements). The trial court overruled the objection on the grounds that it was not a written or recorded statement of Defendant Emory.

On cross-examination, Mr. Beasley testified that he was sitting in his motorized wheelchair when the defendants entered his apartment and that his back was to the door through which they entered. He had been counting his cash, which he placed on the coffee table. Mr. Beasley testified that, as Defendant Emory approached him holding the gun, Defendant Emory picked up the hammer and cash on the coffee table. Mr. Beasley guessed that the gun was a .22 revolver, which he described as a "little small silver cowboy looking gun." Mr. Beasley clarified that Defendant Hartshaw hit him with his elbow, which hurt;

Defendant Emory did not hit anyone. Mr. Beasley recalled his preliminary hearing testimony that Defendant Emory had not pointed the gun at him but "stood over" Mr. Beasley with the gun.

Erin Hodge testified that she knew Mr. Beasley and the defendants. Ms. Hodge recalled the night of October 1, 2016, and she recalled being drunk at Mr. Beasley's apartment. She recalled the defendants coming inside Mr. Beasley's apartment together. Ms. Hodge let Defendant Emory inside after he threw something at the apartment's window and knocked on the front door. Defendant Emory identified himself through the closed door, so Ms. Hodge unlocked it. Ms. Hodge could not remember anything that happened after due to her intoxication. Ms. Hodge recalled giving a statement to the police while drunk.

Outside the presence of the jury, Ms. Hodge was asked about a statement she gave to law enforcement after the robbery. Ms. Hodge had listened to a recording of her statement the day before trial and did not remember making it. When questioned about the statements she made in the recording, Ms. Hodge did not remember any of them. Investigator Michael Washam testified that he was the law enforcement officer who recorded Ms. Hodge's statement, taken on October 10, 2016. Mr. Beasley had called Investigator Washam to say that Ms. Hodge was ready to give a statement. Investigator Washam recounted that Ms. Hodge was articulate and did not seem inebriated. On this basis, the State sought to introduce the recording of Ms. Hodge's statement, pursuant to Tennessee Rule of Evidence 803(26), which provides an exception to the hearsay rule for a prior inconsistent statement of a witness. Ms. Hodge was recalled to the stand and testified that, at the time of the robbery, she was living with Mr. Beasley "on and off" and taking care of him. Ms. Hodge clarified that she listened to her recorded statement in its entirety the day before trial and believed she sounded drunk on the recording and was drunk at the time it was made.

The trial court asked to hear the recorded statement. Defendant Emory objected to the introduction of the statement as being "untrustworthy." Defendant Hartshaw objected to its introduction and argued that the State had not proven by a preponderance of the evidence that the statement was made under circumstances that indicated trustworthiness. The State responded that the circumstances of trustworthiness was a determination to be made by the trial court and that the statement was trustworthy based on its matching Mr. Beasley's testimony and based on Ms. Hodge contacting law enforcement to provide it.

Based on this evidence and the arguments, the trial court found that Ms. Hodge's recorded statement was inconsistent with her trial testimony. The trial court found that Ms. Hodge's testimony on the stand was "extremely untrustworthy" and found that her complete lack of memory of her statement was not credible. The trial court concluded that

6

Ms. Hodge was trying to protect the defendants by lying about her memory so she would not have to testify. The trial court found her recorded statement to Investigator Washam to be trustworthy. The trial court stated:

> I think her statement to Mr. Washam was mostly unprompted narrative. She gave details that he was not aware of, details that he didn't provide her. She even told him, "I'm being 100 percent truthful." She did not sound impaired or intoxicated at all to me. The fact that it was nine days after it, to me, is, is really in favor of the trustworthiness of it, much more so than now where we're a year and a half later. You believe her that she doesn't remember what happened that night now, certainly think it's—it's reasonable to assume that her statement nine days ago--her memory nine days after it happened, would be better than it is a year and a half later.
>
> She showed an unwillingness to say anything to hurt these guys. She didn't stick around the night it happened that we heard some testimony [be]cause she was on probation for whatever reason. She has shown an unwillingness to cooperate with the authorities, except for this one time during this jail phone call. I think the circumstances in this case do show that that--by a preponderance of the evidence that that prior statement was trustworthy, and . . . I'm very hesitant to let statements like this come in about what happened when the person says they can't remember it here.
>
> But under the [] unique circumstances of this case, I'm going to--to make an exception, because I think that this is all part of a pattern of trying to keep testimony out of this case on behalf of these defendants, . . . . [Mr. Beasley] didn't even want to be here to testify in this thing, but we are not going to skirt the demands of justice because people don't want to stand up and say what's right. And so she's not going to tell us what she remembers now, we're going to let what she remembered on October the 10th come into evidence.

The statement was introduced through Investigator Washam's testimony and played aloud for the jury. We will summarize Ms. Hodge's statement later in this opinion when we review Investigator Washam's testimony.

In the presence of the jury, Ms. Hodge testified that, prior to the robbery, she had been in a romantic relationship with Defendant Emory which lasted about three years.

On cross-examination, Ms. Hodge testified that she stayed with Mr. Beasley at his apartment approximately three or four days per week and had seen the defendants there.

7

The defendants were not there often, but when they came over, Mr. Beasley or Ms. Hodge had to "buzz" them in at the main entrance. Ms. Hodge agreed that the defendants had a "standing invitation" to come to Mr. Beasley's apartment.

Andrew Huddleston, an officer with Knoxville Police Department, testified that he was on patrol on October 1, 2016, and that he responded to Mr. Beasley's apartment after his 911 call. Officer Huddleston did not remember his interaction with Mr. Beasley that night and his only recollection of their interaction was based on his written notes. Based on his notes, Officer Huddleston testified that he arrived at Mr. Beasley's apartment complex, spoke to Mr. Beasley, wrote out a report, and then passed the report along to an investigator. Officer Huddleston did remember that Mr. Beasley's apartment was "disheveled." He had no memory of Mr. Beasley or his demeanor on that day.

On cross-examination, Officer Huddleston could not remember how quickly he responded to Mr. Beasley's 911 call. Officer Huddleston agreed that, "typically," the victim of a robbery is in an "excited state" when law enforcement officers arrive at the scene. Officer Huddleston could not, however, remember if Mr. Beasley was in such a state. Officer Huddleston was shown a photograph of Mr. Beasley sitting in his wheelchair on the night of the robbery, and Officer Huddleston testified that he had no memory of Mr. Beasley. Officer Huddleston reiterated that he had no memory of Mr. Beasley's demeanor that night. Officer Huddleston was shown a copy of his report created after the robbery and after his interaction with Mr. Beasley. Officer Huddleston read the report on the stand but stated that it did not refresh his memory with regard to Mr. Beasley's demeanor.

On this basis, the defendants sought to admit Officer Huddleston's report as an inconsistent statement or an excited utterance made by Mr. Beasley. Outside the presence of the jury, Officer Huddleston reiterated that he could not remember what Mr. Beasley said to him that night, independent of his written report. However, after rereading the report, he testified that he remembered that Mr. Beasley informed him that $300 had been taken from his "waistband." On cross-examination, Officer Huddleston testified that he did not show his report to Mr. Beasley. The State objected to the introduction of the report into evidence on the grounds that it contained inadmissible hearsay.

The trial court stated that it was a "close call," but that because Officer Huddleston remembered Mr. Beasley telling him about the $300 in his waistband, he would allow that to be admitted as a prior inconsistent statement. The trial court ruled that Mr. Beasley's entire statement to Officer Huddleston would not be admitted pursuant to the excited utterance hearsay exception because the foundation had not been laid and the report did not constitute a "statement" of Mr. Beasley's. The trial court stated that Mr. Beasley's statement to Officer Huddleston, for the purposes of a police report, was testimonial in

8

nature, unlike a 911 call. The trial court stated that it would instruct the jury that the statement could be considered in assessing Mr. Beasley's credibility.

In the jury's presence, Officer Huddleston testified that he remembered Mr. Beasley telling him that someone had taken $300 from his waistband.

On redirect-examination, Officer Huddleston stated that he prepared his report "later that night" after speaking with Mr. Beasley and that he never reviewed the report with Mr. Beasley. Officer Huddleston testified that Mr. Beasley identified his nephew as the man who robbed him, by the name of "Baron Hartshaw", along with a man named "G" or "Emory."

Following this testimony, the trial court instructed the jury that Officer Huddleston's testimony about what Mr. Beasley had told him could only be considered in assessing Mr. Beasley's credibility and could not be considered as substantive evidence.

Investigator Michael Washam, an investigator of violent crimes with the Knoxville Police Department, testified that he investigated these crimes. Investigator Washam received Officer Huddleston's report and also received a telephone call from Mr. Beasley. Mr. Beasley identified the suspects' and Ms. Hodge's names. Investigator Washam met with Mr. Beasley the following day, October 4, 2016, at Mr. Beasley's apartment, and Mr. Beasley gave a recorded statement consistent with his statement in their telephone call. Mr. Beasley identified the defendants in a photographic lineup. Investigator Washam spoke to the management office at the apartment complex and requested video surveillance from the day of these crimes.

Investigator Washam also conducted a recorded telephone interview with Ms. Hodge, which was played for the jury. In the interview, which is at times unintelligible, Ms. Hodge stated that on October 1, 2016, she was in Mr. Beasley's apartment and someone threw "little pebbles" at the window of the apartment in order to be granted entry to the complex. Soon after, there was a knock at the door, and Ms. Hodge and Mr. Beasley agreed that they would not answer the door. The individual at the door identified himself as Defendant Emory and said he had money to repay Mr. Beasley for a loan. Ms. Hodge let him inside and locked the door behind him. Ms. Hodge denied that he pushed his way inside the apartment. Ms. Hodge said that Mr. Beasley had $386 in cash sitting on the coffee table. Defendant Emory then unlocked the door, and Defendant Hartshaw "busted in" through the door. Ms. Hodge then realized that Defendant Hartshaw had sent Defendant Emory to gain entry to the apartment. Before Defendant Hartshaw "put his hands" on Mr. Beasley, Ms. Hodge assumed this was "all a joke." Ms. Hodge stated that Defendant Emory "pulled the gun" on Ms. Hodge. Ms. Hodge said that Defendant Hartshaw came up behind Mr. Beasley and was "swinging on him" in his face from behind.

Ms. Hodge guessed that the gun was a .22 caliber. Ms. Hodge stated that she sustained injuries on her face from being hit by Defendant Hartshaw. Defendant Hartshaw searched Mr. Beasley's underclothes for his wallet without realizing that the wallet was on the table. Defendant Emory took the cash off the table, and Defendant Hartshaw took the wallet.

In her statement to Investigator Washam, Ms. Hodge recalled that she had been hanging pictures for Mr. Beasley, and so there was a hammer on the table. Defendant Emory picked up the hammer, and when Ms. Hodge confronted the men to give the money back, Defendant Emory acted like he was going to hit Ms. Hodge with the hammer. Ms. Hodge said, "That hammer scared me, because I know he's not scared to use it." The defendants moved for a mistrial on the grounds that the trial court had specifically ordered this statement to be redacted. The trial court denied the motion for mistrial and offered to give a curative instruction to the jury, which the defendants declined so as not to draw attention to the statement.

Investigator Washam testified that he reviewed the apartment complex's surveillance tape and identified the defendants coming to and going from the complex on the date of the robbery. He also identified Ms. Hodge in the surveillance tape. Investigator Washam identified Defendant Emory, while exiting the apartment complex, holding a hammer and Defendant Hartshaw holding a liquor bottle; the two men congratulated each other by doing a "chest bump." Based on Investigator Washam's viewing of the recording, he testified that Defendant Emory went into Mr. Beasley's apartment first, followed by Defendant Hartshaw.

Investigator Washam was asked about jailhouse phone calls, first testified to by Mr. Beasley. The State sought to introduce recordings of the jailhouse calls, and the defendants renewed their objection. The phone calls were played for the jury, and Defendant Hartshaw made multiple statements about Mr. Beasley not showing up to court, not answering his subpoena, or simply dropping the charges against the defendants. The State then sought to introduce a video recording from Mr. Beasley's apartment complex, about which Investigator Washam had testified. He stated that the recording showed the defendants getting in the elevator, followed by Ms. Hodge. Investigator Washam identified Defendant Emory holding a hammer in his hand and Defendant Hartshaw holding a bottle of liquor.

On cross-examination, Investigator Washam testified that Mr. Beasley did not have any visible signs of injury following the robbery.

At the close of the State's case, discussions between the parties ensued about the proposed jury instructions. Defendant Emory requested an instruction that the "deadly weapon" element of aggravated robbery be "the gun" and not the hammer. The State made note of its prior email to Defendant Emory's counsel about including the hammer as the

deadly weapon. The trial court recalled its own ruling, prior to trial, that the hammer would not be considered the deadly weapon and that the State had elected that the deadly weapon would be the gun. This caused the State to posit that it would move to dismiss Counts 3 and 4, however, the trial court noted that those counts could be supported by an argument that the gun was not real. The State decided not to move to dismiss the counts.

Defendant Emory testified that he had been convicted of federal drug trafficking in 2004. He testified that he had been family friends with Mr. Beasley and Defendant Hartshaw for several years and had lived with them at some point. Mr. Beasley had lived in multiple apartments with Defendant Hartshaw, and Defendant Emory had visited both men at all of these residences. He testified that Defendant Hartshaw was always welcome to visit Mr. Beasley where he was living and often visited without providing notice. Defendant Emory testified that on the night of October 1, 2016, he and Defendant Hartshaw went to Mr. Beasley's apartment complex and were let into the main entrance of the complex by a neighbor. Defendant Emory knocked on Mr. Beasley's door, and Ms. Hodge opened the door for him after Mr. Beasley said to let the defendants inside. Defendant Hartshaw and Mr. Beasley began arguing, and Defendant Hartshaw was asking for his money. Defendant Emory saw some cash sitting on the coffee table and pointed it out before leaving the apartment. Defendant Hartshaw followed soon after, and Defendant Emory denied that enough time passed to allow Defendant Hartshaw to assault Mr. Beasley. Ms. Hodge was arguing with Defendant Emory about taking the liquor bottle. He did not observe a physical altercation between Defendant Hartshaw and Mr. Beasley or Ms. Hodge.

Defendant Emory stated that, before he left Mr. Beasley's apartment, he took the cash off the coffee table and a hammer, which he stated belonged to him. About the hammer, Defendant Emory testified that a couple of weeks before this incident, Defendant Emory and Ms. Hodge were hanging pictures for Mr. Beasley at Mr. Beasley's apartment. On that same evening, Mr. Beasley asked Defendant Emory to buy him cigarettes and liquor, and Defendant Emory left the hammer at Mr. Beasley's apartment while he went to do these errands for him. Defendant Emory told Mr. Beasley that he would retrieve the hammer at a later date. This was what caused him to pick up the hammer when he left Mr. Beasley's apartment on the night of this incident. Defendant Emory denied having a gun or being in a disagreement with Mr. Beasley.

On cross-examination, Defendant Emory testified that he knew Mr. Beasley had been receiving an SSI check for "a long time" and that it usually arrived on the first or third day of the month. He agreed that Mr. Beasley had loaned him money in the past. He agreed that he and Defendant Hartshaw went to Mr. Beasley's apartment to get money from him on October 1. He testified that a resident of another apartment recognized the

defendants and let them into the complex. Defendant Emory also agreed that he was drunk and that he could not say whether Defendant Hartshaw had knocked down Mr. Beasley.

Defendant Emory clarified that he found the hammer in Mr. Beasley's kitchen when he first entered the apartment and decided to take it with him to hang something at his mother's house. Defendant Emory again stated that he had taken the hammer to Mr. Beasley's to hang pictures for him, two weeks prior, and left it there when he went to the liquor store for Mr. Beasley. He agreed that he picked up Mr. Beasley's cash off the coffee table while holding the hammer.

Defendant Emory testified that Mr. Beasley offered to drop the charges against the defendants if they paid him back his money. He agreed that he had owned a .22 caliber weapon in the past.

Defendant Hartshaw offered no proof.

The parties reviewed the proposed jury instructions prior to closing argument. Defendant Emory requested, via email to all the parties, that the instructions for aggravated robbery, Counts 1 through 4, specifically make clear that the "deadly weapon" was "the gun." Defendant Emory also requested clarification on the aggravated burglary instruction for Counts 5 and 6. The State responded via email, objecting to any change in the pattern instructions and referring to its prior email to Defendant Emory. The State contended that it had "clarified" to Defendant Emory in the email that it would move forward on the theory that Defendant Emory was "armed with both a hammer and a gun when these crimes were committed" and that both defendants "were aware of the numerous recorded statements of the victim/witnesses stating the same[.]" The trial court denied Defendant Emory's request for a clarifying instruction. The trial court expressed frustration with the issue of including the hammer and it not having been addressed prior to trial. The trial court noted that both defendants were subject to prejudice because of the failure to address this issue and stated that it would allow the State to only argue the gun as the deadly weapon as to counts 1 through 4, and that the jury instructions would reflect that. Defendant Emory then sought clarification as to whether the hammer would be included as an item stolen from Mr. Beasley, or whether it would be argued as "the thing that is fashioned to look like a dangerous weapon," relevant to Count 3 and 4. The trial court responded, seemingly in contrast to its earlier ruling limiting the argument to the gun, that it would let the State argue "whatever they want to argue."

The State then presented its closing argument and made multiple mentions of the hammer, including saying of Defendant Emory, "He pulled a hammer and acted like he was going to hit [Ms. Hodge]." Defendant Emory, in his closing argument, argued that he

12

was in no way trying to obscure the hammer which went toward his contention that he was not stealing the hammer but that it belonged to him.

The trial court proceeded to instruct the jury following closing arguments. For Counts 1 and 2, aggravated robbery, the trial court instructed that the "deadly weapon" would be "the gun." For Counts 3 and 4, the trial court instructed "that the defendant accomplished [the robbery] by display of any article fashioned to lead the alleged victim to reasonably believe it to be a deadly weapon." The trial court did not limit the "article" to "the gun" as it had for Counts 1 and 2. During the deliberations, the jury sent back a question:

> As to element 6 [deadly weapon] under counts 1, 2, 3, and 4, as to counts 1 and 2, the defendant accomplished this act with a deadly weapon (the gun). Does the deadly weapon have to be a gun? Could it be the hammer under counts 1 and 2?"

All parties agreed to the response: "The deadly weapon alleged in counts 1 and 2 is the gun, not the hammer." Thereafter, the jury sent out the following:

> As to counts 3 and 4, element 6 [the deadly weapon], the jury believes that the hammer that was referred to in the testimony constitutes a deadly weapon. The definition of deadly weapon on page 22 refers to anything manifestly designed, made, or adapted for the purpose of infl[i]cting death or serious bodily injury by the manner of its use. As to counts 3 and 4, element 6, it's our assumption . . . that the hammer could be considered a deadly weapon in this case.

The trial court recessed to consider a response to the jury's question, which it noted was actually a statement. The jury returned with its verdict prior to any further response from the trial court. The jury convicted Defendant Hartshaw of two counts of the lesser-included offense of robbery (Counts 1 and 2; Class C felony), two counts of aggravated robbery (Counts 3 and 4; Class B felony), and two counts of aggravated burglary (Counts 5 and 6; Class C felony). The jury convicted Defendant Emory of two counts of the lesser-included offense of robbery (Counts 1 and 2; Class C felony), two counts of aggravated robbery (Counts 3 and 4; Class B felony), one count of aggravated burglary (Count 5; Class C felony), and one count of facilitation of aggravated burglary (Count 6; Class D felony). The jury acquitted the defendants of employing a firearm during the commission of a dangerous felony (Count 7). The remaining counts of the indictment are not at issue in this appeal.

### C. Sentencing

13

Because Defendant Emory challenges the length of his sentence on appeal, we summarize the evidence presented at the sentencing hearing as it pertains to Defendant Emory. The State introduced six certified judgments of conviction for Defendant Emory: evading arrest, reckless endangerment, driving on a revoked license, and felony theft (3). On behalf of Defendant Emory, Brenda Emory testified that she was his mother and that Defendant Emory and his son lived with her. She described him as a good father who helped his son with schoolwork and sports. Ms. Emory testified that her son could live with her if released. Ms. Emory stated that she had suffered a stroke and relied on Defendant Emory to care for her physical needs.

Jermaine Allen, a friend of Defendant Emory's, testified that Defendant Emory had been a positive influence on Mr. Allen and had encouraged him to stay in school and keep out of trouble. Kiawanna Allen testified that her son Jermaine's life had been changed by Defendant Emory's positive influence on him, which included him regularly attending school. Defendant Emory addressed the trial court and stated that he had made a bad decision on the night of the robbery and had not meant to do harm to Mr. Beasley.

The trial court stated that Defendant Emory was a Range I, standard offender. The trial court stated that it was considering the evidence presented, the presentence report, the principles of sentencing, the nature of the crime, the defendants' and the victim's statements, and any enhancement or mitigating factors. The trial court applied enhancement factor (1) to Defendant Emory, that he had a history of prior criminal convictions. T.C.A. § 40-35-114(1) (2019). The trial court applied enhancement factor (2), that Defendant Emory was the leader in the commission of the crime, although it applied little weight to this factor. T.C.A. § 40-35-114(2) (2019). The trial court applied enhancement factor (4), that the victim of the offense was particular vulnerable, and the trial court applied great weight to this factor in light of Mr. Beasley being wheelchair-bound. T.C.A. § 40-35-114(4) (2019). The trial court stated that it applied the most weight to factor (4). The trial court applied enhancement factor (8), based on Defendant Emory's prior probation violation. T.C.A. § 40-35-114(8) (2019). The trial court applied enhancement factor (9), that a deadly weapon was possessed during the commission of the crime. T.C.A. § 40-35-114(9) (2019). Finally, the trial court applied enhancement factor (14), that the defendants abused a position of trust based on their relationship with the victim which significantly facilitated the commission of the offense. T.C.A. § 40-35-114(14) (2019).

Relevant to mitigation, that trial court addressed the fact that Defendant Emory had sole custody of his children and was expecting another child, all of whom would be potentially negatively impacted by a lengthy prison sentence. The trial court also noted

14

that Defendant Emory cared for his mother, as well as the fact that this was his first violent criminal offense. The trial court applied all mitigating factors.

As to Defendant Emory, the trial court imposed the following sentences:

Count 1: Robbery, 6 years (merged with Count 3)
Count 2: Robbery, 6 years (merged with Count 3)
Count 3: Aggravated Robbery, 12 years
Count 4: Aggravated Robbery, 12 years (merged with Count 3)
Count 5: Aggravated Burglary, 6 years
Count 6: Aggravated Burglary, 4 years (merged with Count 5)

The trial court ordered all of Defendant Emory's sentences to run concurrently for a total effective sentence of twelve years.

As to Defendant Hartshaw, the trial court imposed the following sentences:
Count 1: Robbery, 10 years (merged with Count 3)
Count 2: Robbery, 10 years (merged with Count 3)
Count 3: Aggravated Robbery, 15 years
Count 4: Aggravated Robbery, 15 years (merged with Count 3)
Count 5: Aggravated Burglary, 10 years
Count 6: Aggravated Burglary, 10 years (merged with Count 5)

The trial court ordered that all of Defendant Hartshaw's convictions would be served concurrently for a total effective sentence of fifteen years.

It is from these judgments that the defendants now appeal.


## II. Analysis
### A. Sufficiency of the Evidence

The defendants contend that the evidence is insufficient to sustains their convictions for robbery (Counts 1 and 2); aggravated robbery accomplished by display of an article fashioned to lead the victim to reasonably believe it to be a deadly weapon (Counts 3 and 4); and aggravated burglary/facilitation of aggravated burglary (Counts 5 and 6).

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P.

15

13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the

16

convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

## 1. Robbery

Relevant to their convictions for robbery in Counts 1 and 2, the defendants claim that there was no evidence to prove the elements of violence or fear. The State responds, as to the element of violence, that a jury could reasonably conclude, based on Mr. Beasley's testimony and Ms. Hodge's recorded statement, that Defendant Hartshaw physically attacked Mr. Beasley during the course of the robbery. The State notes that Defendant Emory is criminally responsible for this conduct. As to the element of fear, the State points to Mr. Beasley's testimony that, once he realized the defendants were not joking and were instead trying to forcibly take his property, he felt fear. This, the State contends, is sufficient evidence to support the defendants' convictions in Counts 1 and 2. We agree with the State.

Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear. T.C.A. § 39-13-401(a) (2019). "If an individual uses violence or puts another in fear to obtain or exercise control over another's property, he or she has committed a robbery. Therefore, whether a taking is properly characterized as a theft or a robbery is contingent upon whether and when violence or fear is imposed." *State v. Owens*, 20 S.W.3d 634, 638 (Tenn. 2000). "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a).

The evidence presented here, viewed in the light most favorable to the State, was that the victim allowed Defendant Emory inside his apartment and that Defendant Emory then let Defendant Hartshaw inside. Defendant Hartshaw then jumped on Mr. Beasley, knocking him to the floor in his wheelchair, and took money out of the waistband of his pants. The defendants also took money off his coffee table and other personal items. Mr. Beasley testified that he was hit by an elbow and that, while he originally thought the defendants were joking with him, became fearful when he realized they were trying to take things from him. This is sufficient evidence from which a jury could conclude that the defendants intentionally took money and items belonging to Mr. Beasley by violence or through fear. The defendants are not entitled to relief on this issue.

## 2. Aggravated Robbery

17

As to the defendants' convictions for aggravated robbery in Counts 3 and 4, they claim that there was no evidence of the robbery being accomplished through the "display of an article fashioned to lead [Robert Beasley] to reasonably believe it to be a deadly weapon." They argue that there was no evidence presented that the "alleged gun was anything but a real gun," and thus, there was insufficient proof of that element of the crime. They further argue that there was no evidence of the hammer being "fashioned" to lead Mr. Beasley to believe it to be a deadly weapon. On these grounds, they argue that there is insufficient evidence to sustain their convictions in Counts 3 and 4. The State responds that the jury could have reasonably concluded that either the hammer or the object Mr. Beasley described as "the gun" was an article fashioned to lead Mr. Beasley to reasonably believe it to be a deadly weapon. We agree with the State.

An aggravated robbery is a robbery "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-402(a)(1). A deadly weapon includes "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." T.C.A. § 39-11-106(a)(6)(B). This court has previously ruled that it is not necessary to display an actual weapon in order to meet the requirements of the aggravated robbery statute, s*ee State v. Davenport*, 973 S.W.2d 283, 286 (Tenn. Crim. App. 1998), but that a victim's "perceived threat of a weapon" is sufficient to uphold a conviction for aggravated robbery. *See State v. Frederick Corlew*, No. M2001-00842-CCA-R3-CD, 2002 WL31478266, at *3 (Tenn. Crim. App., Nashville, Nov. 1, 2002).

Viewing the evidence presented at trial in the light most favorable to the State, we conclude that there was sufficient evidence of an article being used or displayed to lead Mr. Beasley to reasonably believe it to be a deadly weapon. The evidence presented at trial was that Defendant Emory wielded a gun (or what appeared to Mr. Beasley and Ms. Hodge to be a gun) and had a hammer when the defendants were inside Mr. Beasley's apartment and forcibly taking his money and property. Mr. Beasley, Ms. Hodge, and Defendant Emory all testified that Defendant Emory picked up the red hammer from Mr. Beasley's coffee table and was holding the hammer at the time that the defendants were forcibly taking money from Mr. Beasley. A jury could infer from this fact that the hammer was "used or fashioned" to lead Mr. Beasley to reasonably believe it to be a deadly weapon, "capable of causing death or serious bodily injury." *See* T.C.A. § 39-13-402(a)(1), 39-11-106(a)(6)(B). Although the jury's verdict in Counts 1 and 2 show a reasonable doubt as to "the gun" instruction for these counts, either the object Mr. Beasley described as the gun or the hammer could have led him to perceive that he was being robbed with a deadly weapon. The defendants are not entitled to relief.

### 3. Aggravated Burglary

18

Finally, as to the defendants' convictions for aggravated burglary in Counts 5 and 6 (Defendant Emory was convicted of facilitation of aggravated burglary in Count 6), the defendants argue that there is insufficient proof that the defendants entered Mr. Beasley's dwelling without his effective consent. The State responds that the evidence presented by the victim was that Defendant Hartshaw did not have permission to enter the apartment, but instead gained entry via Defendant Emory, and that Defendant Emory gained consent to enter the apartment via deception. We agree with the State.

As pertinent here, a person commits aggravated burglary who, without the effective consent of the property owner, enters a habitation with the intent to commit a felony, theft, or assault. T.C.A. §§ 39-14-403(a), 39-14-402(a)(1) (2018). "'Effective consent' means assent in fact, whether express or apparent, including assent by one legally authorized to act for another. Consent is not effective when . . . [i]nduced by deception. . . ." *Id.* § 39-11-106(a)(9)(A). "A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." T.C.A. § 39-11-403(a) (2018). "'Knowing' refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." T.C.A. § 39-11-302(b).

The evidence presented at trial and viewed in the light most favorable to the State was that Defendant Emory gained entry to the victim's apartment complex, along with Defendant Hartshaw, after being granted entry by another apartment resident who recognized the two men. Once inside the complex, Defendant Emory started knocking on the victim's door and identified himself. The victim allowed Defendant Emory into his apartment, believing him to be coming to repay money owed to Mr. Beasley, and then the door was shut behind him and locked. Defendant Emory then unlocked the door and allowed Defendant Hartshaw to enter the residence; Defendant Hartshaw immediately jumped on the victim and knocked him to the floor. He later stole money and property from the victim. We conclude that this evidence is sufficient from which a jury could conclude that Defendant Hartshaw entered the victim's apartment without the effective consent of the victim with the intent to commit a theft therein, and thus is sufficient to sustain his conviction for aggravated burglary. Similarly, this is sufficient evidence from which the jury could conclude that Defendant Emory provided substantial assistance to Defendant Hartshaw's crime sufficient to sustain Defendant Emory's conviction for facilitation of aggravated burglary. The defendants are not entitled to relief on this claim.

**B. Jury Instructions**

19

The defendants contend that the trial court improperly instructed the jury for Counts 3 and 4 because a clarifying instruction was necessary, in light of the clarifying instruction given for Counts 1 and 2 ("deadly weapon (the gun)"). Defendant Emory contends that he and Defendant Hartshaw relied throughout the trial on the State's election of the gun as the deadly weapon, particularly because Defendant Emory elected to testify after the trial court's ruling that it would limit the deadly weapon to the gun. The State responds that both defendants waived this issue by failing to include a transcript of the jury instructions in the appellate record. We note that a supplemental filing of the transcript of the jury instructions has eliminated this waiver issue. The State alternatively contends that the instructions were fair and proper. Defendant Emory additionally contends that the trial court provided improper assistance to the State during the conference on the proposed instructions, when it suggested a theory upon which the State could proceed on Counts 3 and 4.

A trial court has the duty to fully instruct the jury on the general principles of law relevant to the issues raised by the evidence. *See State v. Burns*, 6 S.W.3d 453, 464 (Tenn. 1999); *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *State v. Elder*, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998). Nothing short of a "'clear and distinct exposition of the law'" satisfies a defendant's constitutional right to trial by jury. *State v. Phipps*, 883 S.W.2d 138, 150 (Tenn. Crim. App. 1994) (quoting *State v. McAfee*, 737 S.W.2d 304 (Tenn. Crim. App. 1987)). In other words, the trial court must instruct the jury on those principles closely and openly connected with the facts before the court, which are necessary for the jury's understanding of the case. *Elder*, 982 S.W.2d at 876. A jury instruction is considered "prejudicially erroneous," only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Stephenson*, 878 S.W.2d 530, 555 (Tenn. 1994)).

Generally, the right to a trial by jury guarantees that a verdict rests on the jurors' unanimous conclusion that the defendant committed one particular criminal act. *State v. Kendrick*, 38 S.W.3d 566, 568 (Tenn. 2001). "A defendant's right to a unanimous jury before conviction requires the trial court to take precautions to ensure that the jury deliberates over the particular charged offense, instead of creating a "patchwork verdict" based on different offenses in evidence." *Id.* (quoting *State v. Shelton*, 851 S.W.2d 134, 137 (Tenn. 1993)).

With these principles in mind, we conclude that the trial court's instructions to the jury did not fail to guarantee a unanimous verdict that the defendants committed aggravated robbery. *See State v. Lemacks*, 996 S.W.2d 166, 171 (Tenn. 1999) (stating that "The right of jury unanimity has never required more than a general verdict in cases where only one offense is at issue based on a single criminal occurrence. In such cases . . . where the State

seeks to prove one crime arising from one event, we may presume that the jury's general verdict was unanimous.)

In our view, as concerns Counts 1, 2, 3, and 4, this case is controlled by *Lemacks*. As was the defendant in *Lemacks*, the defendants were charged with only one offense (aggravated robbery) and the evidence only established the commission of one offense (aggravated robbery). Likewise, the State relied on two possible theories of guilt (that the robbery was accomplished through the use of a gun or through the use of an article which Mr. Beasley believed to be a deadly weapon). As previously discussed, the evidence was sufficient to support a conviction under either theory. Thus, the trial court properly instructed the jury on both theories. Moreover, under *Lemacks*, the trial court was not required to instruct the jury that it must unanimously agree on one theory of guilt. *Id.* Similarly, under *Lemacks*, the return of a general verdict did not violate the defendants' right to a unanimous verdict because we presume that the verdict was unanimous. *Id.* The defendants are not entitled to relief on this issue.

As to Defendant Emory's contention that the trial court provided improper assistance to the State, we disagree. We conclude that the trial court was simply pointing out the evidence that had been presented which could support convictions in Count 3 and 4. Defendant Emory is not entitled to relief on this contention.

## B. Admission of Evidence

The defendants challenged the admission or exclusion of several items of evidence. Generally, "[a]dmission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion." *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004). The Tennessee Rules of Evidence provide that all "relevant evidence is admissible," unless excluded by other evidentiary rules or applicable authority. Tenn. R. Evid. 402. Of course, "[e]vidence which is not relevant is not admissible." *Id.* Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Evidence which qualifies as "hearsay" is also excluded from admission at trial. Under Tennessee Rule of Evidence 801, "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." "The standard of review for rulings on hearsay evidence has

multiple layers." *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015), *cert. denied*. The "factual and credibility findings" made by the trial court when considering whether a statement is hearsay, "are binding on a reviewing court unless the evidence in the record preponderates against them." *Id.* (citing *State v. Gilley*, 297 S.W.3d 739, 759-61 (Tenn. Crim. App. 2008)). "Once the trial court has made its factual findings, the next questions – whether the facts prove that the statement (1) was hearsay and (2) fits under one the exceptions to the hearsay rule – are questions of law subject to *de novo* review." *Id.* at 479 (citations omitted).

### 1. Ms. Hodge's Statement to Investigator Washam

The defendants contend that Ms. Hodges's recorded telephone conversation with Investigator Washam should not have been admitted as a prior inconsistent statement of a testifying witness pursuant to the hearsay exclusion exception found at Tennessee Rule of Evidence 803(26). They contend that the statement was not made under "circumstances indicating trustworthiness." *See* Tenn. R. Evid. 803(26)(C). They further argue that the State failed to fully redact the recording, which resulted in prejudicial material being played for the jury. The State responds that the trial court properly found by a preponderance of the evidence that the recorded statement was trustworthy, based on a number of factors. The trial court found that Ms. Hodge's testimony at trial was "extremely untrustworthy." The State contends that the trial court's findings should not be second-guessed on appeal, so the statement was properly admitted. The State further argues that any portion of the statement played for the jury which should have been redacted did not result in undue prejudice. We agree with the State.

Tennessee Rule of Evidence 803(26) provides that a prior inconsistent statement that is otherwise admissible under Rule 613(b) is admissible as substantive evidence if the following prerequisites are met:

(A) The declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement.
(B) The statement must be an audio or video recorded statement, a written statement signed by the witness, or a statement given under oath.
(C) The judge must conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the prior statement was made under circumstances indicating trustworthiness.

This rule has been interpreted to apply when a testifying witness claims a lack of memory, as Ms. Hodge did in the present case. *State v. Davis*, 466 S.W.3d 49, 64 (Tenn. 2015). Additionally:

[Tennessee Rule of Evidence 803](26) alters Tennessee law by permitting some prior inconsistent statements to be treated as substantive evidence. Many other jurisdictions have adopted this approach to address circumstances where witnesses suddenly claim a lack of memory in light of external threats of violence which cannot be directly attributed to a party, for example. This rule incorporates several safeguards to assure that the prior inconsistent statements are both reliable and authentic.

To be considered as substantive evidence the statement must first meet the traditional conditions of admissibility which include the procedural aspects of inconsistent statements as addressed in Rule 613. This reference also makes clear that only prior inconsistent statements, and not consistent statements, are within the ambit of this rule.

*State v. Davis*, 466 S.W.3d 49 (Tenn. 2015) (citing Tenn. R. Evid. 803(26) *advisory commission cmt.* (2009)).

Tennessee Rule of Evidence 613(b) permits the use of extrinsic evidence of prior inconsistent statements for the purpose of impeachment. The Rule provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Again, the "factual and credibility findings" made by the trial court when considering whether a statement is hearsay, "are binding on a reviewing court unless the evidence in the record preponderates against them." *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). "Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one [of] the exceptions to the hearsay rule—are questions of law subject to *de novo* review." *Kendrick*, 454 S.W.3d at 479 (citing *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007). "If a hearsay statement does fit under one of the exceptions, the trial court may not use the hearsay rule to suppress the statement." *Kendrick*, 454 S.W.3d at 479.

Here, Ms. Hodge testified that she was intoxicated when she made the telephone call to Investigator Washam and could not remember making the statement. She also testified that she was intoxicated the night of the robbery and did not know what happened. The trial court found her testimony not to be credible, stating that she appeared to be protecting the defendants from prosecution and otherwise showed a "pattern of lying." On the other hand, the trial court considered the circumstances of her telephone call to Investigator Washam, including that it was "unprompted," the clarity with which she spoke, and her assertion during the call that she was telling the truth. The evidence does

23

not preponderate against the trial court's credibility determination that Ms. Hodge was being untruthful at trial but gave a truthful statement to Investigator Washam. Accordingly, her statement to Investigator Washam was properly admitted, as substantive evidence, as a prior inconsistent statement pursuant to a proper hearsay exclusion exception. The defendants are not entitled to relief on this issue.

It is clear that a portion of Ms. Hodge's statement pertaining to Defendant Emory not being scared to use the hammer was heard by the jury despite the trial court's ruling to redact that portion. We note that the defendants twice declined a curative instruction as to that portion of Ms. Hodge's statement and moved for a mistrial. Having concluded that this statement was admitted in error, we must determine the error's effect and the mistrial issue.

Our supreme court has said that when a trial court errs by admitting evidence that is forbidden under the Tennessee Rules of Evidence, we address this non-constitutional error using the harmless error analysis of Tennessee Rule of Appellate Procedure 36(b). *See State v. Clark*, 452 S.W.3d 268, 287-88 (Tenn. 2014). The defendant bears the burden of showing that the erroneous evidence "more probably than not" affected the verdict. To conduct a harmless error review pursuant to Rule 36(b), *Clark* instructs us to review the entire record in order to ascertain the actual evidentiary basis for the jury's verdict. *Id.* "The crucial consideration is what impact the error may reasonably have had on the jury's decision-making process," and, when the error more probably than not had a substantial and injurious impact on the jury's decision-making process, it is not harmless. *Id.* at 288.

We conclude that the admission of the portion of Ms. Hodge's statement was harmless. *See State v. Banks*, 271 S.W.3d 90, 126 (Tenn. 2008). The defense theory was that the hammer belonged to Defendant Emory and was there for the purposes of hanging pictures; Defendant Emory admitted that he picked up the hammer and was holding it while Mr. Beasley was being robbed. Mr. Beasley also testified that Defendant Emory picked up the hammer. From this, the jury concluded that the hammer had been utilized in a manner to lead Mr. Beasley to reasonably believe it to be a deadly weapon. As the State points out, Ms. Hodge's statement that Defendant Emory was "not afraid to use it" permitted the inference that she believed that Defendant Emory had previously used a hammer as a weapon against someone at some time. Importantly, the issue here was what Mr. Beasley perceived about Defendant Emory's display and use of the hammer during the robbery. Any prejudicial effect of this brief and non-specific statement by Ms. Hodge was minimal. Additionally, we conclude that there was no manifest necessity for a mistrial based on the jury hearing this statement. *See Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977) (stating that the purpose of a mistrial is to correct the damage done to the judicial process when some event has occurred that would preclude an impartial verdict,

24

and that a mistrial should be declared only if there is a manifest necessity for such action.) The Defendant is not entitled to relief on this basis.


## 2. Defendant Hartshaw's Jailhouse Calls

The defendants contend that the trial court erred when it admitted Defendant Hartshaw's jailhouse phone calls, which contained evidence of his "bad acts", i.e., intimidating a witness, without properly analyzing the evidence pursuant to Tennessee Rule of Evidence 404(b). Defendant Emory contends that the calls violated his rights under the Confrontation Clause because Defendant Hartshaw made an incriminating statement implicating his involvement in the robbery. The State responds that the jailhouse calls were relevant and highly probative of Defendant Hartshaw's guilty conscience, and should not have been excluded as improper character evidence. The State contends that the trial court conducted a proper weighing of the probative value versus the prejudicial nature of the evidence. As to the Confrontation Clause argument, the State responds that the calls were not offered for the truth of the matter asserted, and thus, there was no violation of Defendant Emory's right to confrontation. We agree with the State.

Rule of Evidence 404 prohibits evidence of other crimes, wrongs, or acts offered to show a character trait in order to prove that a defendant acted in conformity with that character trait. Tenn. R. Evid. 404(b). The trial court may admit the evidence for non-character purposes if four conditions are met:

> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). If a trial court "substantially complies" with these requirements, this court will review for an abuse of discretion. *State v. McCary*, 119 S.W.3d 226, 244 (Tenn. Crim. App. 2003) (citing *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997)). If the evidence sought to be admitted is relevant to an issue other than the accused's character, such as identity, motive, common scheme, intent, or rebuttal of accident or mistake, it may be admitted for that purpose so long as the danger of unfair prejudice does not outweigh the probative value. Tenn. R. Evid. 404(b), *Advisory Comm'n Cmts.*; *McCary*, 119 S.W.3d at 243.

At the pre-trial hearing on the motion to exclude the calls, the trial court ruled that some of the calls were inadmissible, but concluded that it would admit the calls which it concluded were evidence of Defendant Hartshaw's "guilty conscience," and thus were highly probative of Defendant Hartshaw's guilt. The trial court stated that the calls "in no way" implicated or referenced Defendant Emory's involvement in the crime. The trial court concluded that the probative value of this evidence was not outweighed by the danger of unfair prejudice to either defendant.

With regard to the 404(b) issue, the trial court stated that it had listened to all of the recordings and found that there was clear and convincing evidence that these calls were recordings of Defendant Hartshaw's voice. The trial court identified the material issue as Defendant Hartshaw's guilty conscience as evidenced by Defendant Hartshaw's expressed hope that Mr. Beasley would not testify against him at trial. We cannot conclude that the trial court abused its discretion in admitting the jailhouse calls and the defendants are not entitled to relief as to this issue.

As to Defendant Emory's Confrontation Clause argument, we agree with the State that the calls were not hearsay, because they were being offered to show Defendant Hartshaw's state of mind, rather than the truth of the matter asserted. *See State v. Daron Hall*, No. E2018-00699-CCA-R3-CD, 2019 WL 2929087 (Tenn. Crim. App., at Knoxville, July 8, 2019 ("In order for the Confrontation Clause to be implicated, [*Crawford v. Washington*, 541 U.S. 36 (2004)] requires a hearsay statement to be introduced to prove the truth of the matter asserted in a testimonial statement."), *perm. app. denied* (Tenn. Dec. 4, 2019). Defendant Emory is not entitled to relief as to this issue.

### 3. Excited Utterance Exception to Hearsay

The defendants contend that the trial court erred when it declined to admit Mr. Beasley's statement to Officer Huddleston pursuant to the excited utterance exception. The State responds that Officer Huddleston could not remember Mr. Beasley's demeanor when he responded to the call, and thus, the foundation was not laid to admit anything Mr. Beasley said pursuant to the excited utterance exception. We agree with the State.

Pursuant to Rule of Evidence 803(2), the hearsay rule does not exclude "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2). "Underlying the excited utterance exception is the theory that 'circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication.'" *State v. Franklin*, 308 S.W.3d 799, 823 (Tenn.

2010) (quoting *State v. Land*, 34 S.W.3d 516, 528 (Tenn. Crim. App. 2000)). Three requirements must be met for a statement to qualify as an excited utterance:

> The first requirement is a startling event or condition that suspends the normal, reflective thought processes of the declarant. Second, the statement must relate to the startling event or condition. This broad requirement offers considerable leeway such that the statement may describe all or part of the event or condition, or deal with the effect or impact of that event or condition. The third and final requirement dictates that the declarant make the statement while under the stress or excitement from the event or condition. This requirement considers a variety of factors, including the interval of time between the startling event and the statement.

*Id.* (footnotes, citations, and internal quotation marks omitted). The excited utterance exception also has a competency requirement where "the declarant must have had an opportunity to observe the facts contained in the extrajudicial statement." *Land*, 34 S.W.3d at 529. The "'ultimate test'" of whether a statement is admissible within the excited utterance exception is "'spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement or strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication.'" *Franklin*, 308 S.W.3d at 823 (quoting *State v. Smith*, 857 S.W.2d 1, 9 (Tenn. 1993)).

We conclude that Officer Huddleston's testimony was not sufficient to establish that Mr. Beasley made any statements prompted by the startling event of the robbery. Officer Huddleston's memory was not clear as to Mr. Beasley's demeanor or whether he was still under the stress of the event. Accordingly, the trial court did not abuse its discretion when it declined to admit Mr. Beasley's statements pursuant to this exception. The defendants are not entitled to relief as to this issue.

### C. State's Opening and Closing Arguments

The defendants contend that the State committed prosecutorial misconduct during its opening and closing arguments by referring to items not in evidence, specifically the hammer, by vouching for Mr. Beasley's credibility, and by appealing to the jury's emotions about Mr. Beasley's living arrangements. The State responds that the defendants have waived this issue for failing to raise contemporaneous objections and are not entitled to plain error relief.

The record indicates that defense counsel raised this argument in the motion for new trial hearing, and so, although failure to contemporaneously object risks waiver of an issue

on appeal, we choose to address the argument in its merits.  "[A]rgument of counsel is a valuable privilege that should not be unduly restricted."  *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975).  Tennessee courts give great latitude to counsel arguing their cases to the jury.  *Id.*  Thus, "trial judges have wide discretion in controlling the argument of counsel, and their action will not be reviewed absent abuse of that discretion."  *Id.*  However, the comments of counsel during closing argument "'must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried.'"  *State v. James Rae Lewter*, No. M2010-01283-CCA-RM-CD, 2011 WL 1197597, at *4 (Tenn. Crim. App., at Nashville, Mar. 31, 2011) (quoting *State v. Gann*, 251 S.W.3d 446, 459 (Tenn. Crim. App. 2007)), *no perm. app. filed*.

"A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument."  *State v. Banks*, 271 S.W.3d 90, 131 (Tenn. 2008) (citing *United States v. Young*, 470 U.S. 1, 11-13 (1985*); State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001) (holding that a prosecutor's improper closing argument does not automatically warrant reversal)).  To establish reversible error and succeed on a claim of prosecutorial misconduct, the appellant must show that "the argument of the prosecutor was so inflammatory or the conduct so improper that it affected the verdict to his detriment."  *State v. Farmer*, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996) (citing *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965)).

When determining whether the argument affected the jury's verdict, we consider the following five factors:

> (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.

*Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App .1976).

The defendants complain of multiple statements by the State during closing argument that referred to: (1) the victim compensation fund; (2) Defendant Emory's use of the hammer and the gun on Mr. Beasley and Ms. Hodge to "keep them from fighting back;" (3) the State's opinion about Mr. Beasley's credibility; and (4) an appeal to the emotions of the jury.  We have carefully reviewed the record of the State's closing arguments, and we conclude that nothing in these arguments was "so inflammatory or the conduct so improper that it affected the verdict" to the defendants' detriment.  *See Farmer*, 927 S.W.2d at 591.  The trial court instructed the jury that "Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but

28

they are not evidence. If any statements were made that you believe are not supported by the evidence, you should disregard them." The jury is presumed to have followed the trial court's instructions. *State v. Butler*, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). The defendants are not entitled to relief.

## E. Sentencing

Lastly, Defendant Emory argues that the trial court erred when it sentenced him to the maximum sentence within the applicable range, because it did so to "match" his sentence to his co-defendant's, which he contends is inconsistent with the purposes and principles of sentencing. The State responds that the trial court did not abuse its discretion by imposing a within-range sentence. The State asserts that Defendant Emory's sentence is also consistent with the purposes and principles of the Sentencing Act and, therefore, should be affirmed. We agree with the State.

On appeal, a defendant bears the burden of establishing that his sentence is improper. T.C.A. § 40-35-401 (2019), *Sentencing Comm'n Cmts*; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). Appellate review of sentences is under the abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (2012); *see also State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). In the context of sentencing, as long as the trial court places the sentence within the appropriate range and properly applies the purposes and principles of the Sentencing Act, this Court must presume the sentence to be reasonable. *Bise*, at 704-07. As the *Bise* Court stated, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id*. at 708.

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative

office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2019); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The trial court stated that it had considered the evidence at trial, the parties' arguments as to sentencing, the presentence report, the principles of sentencing and the statistical information provided by the Administrative Office of the Courts. The trial court found multiple applicable enhancement factors, which it applied to Defendant Emory's sentence. The trial court applied enhancement factor (1) to Defendant Emory, that he had a history of prior criminal convictions. T.C.A. § 40-35-114(1). The trial court applied enhancement factor (2), that Defendant Emory was the leader in the commission of the crime, although it applied little weight to this factor. T.C.A. § 40-35-114(2). The trial court applied enhancement factor (4), that the victim of the offense was particular vulnerable, and the trial court applied great weight to this factor in light of Mr. Beasley being wheelchair-bound. T.C.A. § 40-35-114(4). The trial court stated that it applied the most gravity to factor (4). The trial court applied enhancement factor (8), based on Defendant Emory's prior probation violation. T.C.A. § 40-35-114(8). The trial court applied enhancement factor (9), that a deadly weapon was possessed during the commission of the crime. T.C.A. § 40-35-114(9). Finally, the trial court applied enhancement factor (14), that the defendants abused a position of trust based on their relationship with the victim which significantly facilitated the commission of the offense. T.C.A. § 40-35-114(14). The trial court also considered applicable mitigating factors, noting the evidence that supported mitigation. Based upon the applicable enhancement factors, the trial court ordered the maximum sentence in the range.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c) (2019).

Although the trial court should also consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. *See* T.C.A. § 40-35-114; *see also*

*Bise*, 380 S.W.3d at 699 n.33, 704; *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate Courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346.

We conclude that the trial court properly sentenced Defendant Emory. The trial court considered the relevant principles and sentenced Defendant Emory to a within range sentence. Based on the evidence at trial and Defendant Emory's criminal history provided in the presentence report, the sentence imposed on Defendant Emory was not excessive, and the trial court did not abuse its discretion. Accordingly, we conclude that Defendant Emory is not entitled to relief as to this issue.

### F. Cumulative Error

Defendant Emory contends that the cumulative effect of the errors in this case deprived him of a fair trial. The cumulative error doctrine recognizes that there may be many errors committed in trial proceedings, each of which constitutes mere harmless error in isolation, but "have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). To warrant review under the cumulative error doctrine, there must have been more than one actual error during the trial proceedings. *Hester* at 77. Here, we have found only one error, and we have concluded that the error was harmless. Thus, cumulative error review is unwarranted.

### III. Conclusion

Based on the foregoing, the trial court's judgments are affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE

31